J-A28002-18

2019 PA Super 25

| | | |
|---|---|---|
| IN RE: ESTATE OF ALEXANDER T. TSCHERNEFF, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: DIMITER B. TSCHERNEFF | : : : : : : | |
| | : | No. 886 MDA 2018 |

Appeal from the Order Entered April 30, 2018
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s): 2216-0827

BEFORE: LAZARUS, J., OLSON, J., and MUSMANNO, J.

OPINION BY LAZARUS, J.:                    **FILED FEBRUARY 01, 2019**

Dimiter B. Tscherneff, Executor of the Will of Alexander T. Tscherneff, Deceased ("Executor" and "Testator," respectively), appeals from the order, entered in the Court of Common Pleas of Dauphin County, Orphans' Court Division, which, *inter alia*, denied Executor's petition for adjudication and directed the filing of an amended account to include a B & B Bank account titled jointly in the names of Executor, in his individual capacity, and Karin Overby ("Karin"), a daughter of the Testator. Upon careful review, we reverse.

Testator died on July 12, 2016, leaving a will dated May 13, 1999. Testator was survived by two sons, Executor and Peter Tscherneff ("Peter"), and two daughters, Karin and Ingrid Stow ("Ingrid"). Pursuant to the terms of Testator's will, Testator left his entire estate to his wife, Margot, whom he also appointed as Executrix. Margot, however, predeceased him; in that

event, the terms of his will provided that the estate was to be distributed to his four children in equal shares and Dimiter was appointed Executor.

During Testator's lifetime, Dimiter also acted as agent for Testator pursuant to a power of attorney. In his capacity as agent, Dimiter "made considerable distributions to himself and his sisters in recognition of their care for the Testator" during his lifetime. Orphans' Court Opinion, 4/30/18, at [2]. By the time of Testator's death, the only asset remaining in his estate was the balance of a TD Ameritrade account. The B & B Bank account, titled in the names of Dimiter and Karin, "had been funded with Decedent's money during his life and used by Dimiter to pursue Decedent's needs and wishes." *Id.*

Letters Testamentary were issued to Dimiter on September 16, 2016. On July 20, 2017, Executor filed his First and Final Account with Petition for Adjudication and Statement of Proposed Distribution. The sole asset accounted for was the TD Ameritrade account valued at $143,238.01. The B & B Bank account was not included in the account.

On October 27, 2017, Peter filed a petition to remove Dimiter as Executor, claiming that Dimiter was "mismanaging the Estate assets and misappropriated Decedent's assets prior to Decedent's death." Petition to Remove, 10/27/17, at ¶ 3. Dimiter filed an answer on November 21, 2017. The court held a hearing on the petition on April 2, 2018 and, by order dated April 13, 2018, denied Peter's request to remove Dimiter as Executor. Peter did not appeal that order.

On April 30, 2018, the court issued a memorandum and order denying

Executor's petition for adjudication. Relevant to this appeal, the Orphans'

Court ordered that the remaining balance of the TD Ameritrade account be

paid to Peter, rather than divided equally amongst the four siblings as

proposed by Executor in his Statement of Proposed Distribution. The court

further ordered Executor to file an amended account that was to include the

proceeds of the B & B Bank account. In doing so, the court reasoned as

follows:

> At the time of the hearing on April 2, 2018, considerable testimony was provided by Dimiter regarding discussions with [Testator], [Testator's] broker, his sisters and brother regarding distributions of "advance[d] funds" to [Testator's] children prior to his death. The [c]ourt finds that [Testator's] intent that his children share in his estate in equal share during his lifetime was faithfully followed by Dimiter acting within his then[-]authority as [Testator's agent under a] Power of Attorney. . . . The [c]ourt has determined that [Testator's] intent, as evidenced by Dimiter's distribution of "advanced funds" acting as [agent under a] Power of Attorney[,] pursuant to the Will and in view of the testimony produced at the hearing, is carried out in the distribution of the assets remaining at the time of his death [to Peter].

Orphans' Court Opinion, 4/30/18, at [2-3].

Executor filed a notice of appeal to this Court on May 30, 2018, followed

by a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Executor

raises the following issues for our review:

> 1. Did the [O]rphans' [C]ourt err in relying on extrinsic evidence to determine the testator's intent, where the language of the will was clear and unambiguous, and where, rather than carrying out [T]estator's express desires and intentions, as set forth in the will, such determination instead totally frustrated the terms of the will

and completely altered the scheme of distribution provided for therein?

2. Did the [O]rphans' [C]ourt err in modifying the terms of the will, based solely upon extrinsic evidence concerning events which took place *after* [T]estator executed the will, where the [O]rphans' [C]ourt implicitly concluded that the testator's intent *at the time of execution* was clear and unambiguous, and where the various events upon which the [O]rphans' [C]ourt relied took place years after [T]estator executed the will?

3. Did the [O]rphans' [C]ourt err in disregarding the clear and unambiguous meaning of the language of [T]estator's will, apparently to accomplish what the [O]rphans' [C]ourt felt to be the "fair" result, by treating pre-mortem transfers to certain residuary legatees as *de facto* advances in lieu of their respective shares of [T]estator's estate?

4. Did the [O]rphans' [C]ourt err in considering extrinsic evidence to determine [T]estator's intent, where construction of the will was not at issue, and where the [O]rphans' [C]ourt did not find nor did any party assert the existence of any patent or latent ambiguity in the will?

5. Alternatively, assuming *arguendo* that the [O]rphans' [C]ourt found uncertainty or ambiguity in the will, did the [O]rphans' [C]ourt err in failing to first determine that such uncertainty or ambiguity existed on the face of the will before relying solely on extrinsic evidence?

6. Did the [O]rphans' [C]ourt err in refusing to confirm Executor's First and Final Account, presumably based solely on the fact that the [a]ccount did not include a certain bank account (referred to by the [O]rphans' [C]ourt as the "B & B Bank account"), where such bank account is a non-probate asset, and where [Testator] was not even a joint owner of such bank account at the time of his death?

7. In directing Executor to include the B & B Bank account in an amended First and Final Account, thereby implicitly determining that the B & B Bank account is an asset of [Testator's] estate, did the [O]rphans' [C]ourt err in reaching a result that is contrary to the provisions of the Multiple-Party Accounts Act, 20 Pa.C.S.[A.] §§ 6301-6306?

- 4 -

8. Alternatively, assuming *arguendo* that the decedent possessed a legally cognizable ownership interest in the B & B Bank account at the time of his death, did the [O]rphans' [C]ourt err in relying solely upon its interpretation of the will and [Testator's] testamentary intent as the basis for its implied determination that the B & B Bank account is an asset of the decedent's estate?

Brief of Appellant, at 4-7 (emphasis in original).

Our standard of review of the findings of an Orphans' Court is deferential.

When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.

However, we are not constrained to give the same deference to any resulting legal conclusions.

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016), quoting *In re Estate of Harrison*, 745 A.2d 676, 678–79 (Pa. Super. 2000). The decision of the Orphans' Court will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law. *In re Estate of Luongo*, 823 A.2d 942, 951 (Pa. Super. 2003). This Court's standard of review of questions of law is *de novo*, and the scope of review is plenary, as we may review the entire record in making our determination. *Kripp v. Kripp*, 849 A.2d 1159, 1164 n.5 (Pa. 2004).

This matter involves the Orphans' Court's interpretation of Testator's will and its determination as to Testator's testamentary intent. Our Supreme Court has repeatedly stated that

[t]he testator's intention is the polestar in the construction of every will and that intention must be ascertained from the language and s[c]heme of his entire will together with the surrounding facts and circumstances; it is not what the Court thinks he might or would or should have said in the existing circumstances, or even what the Court thinks he meant to say, but what is the meaning of his words.

*In re Houston's Estate*, 201 A.2d 592, 595 (Pa. 1964) (brackets omitted).

Technical rules or canons of construction should be resorted to only if the language of the will is ambiguous or conflicting or the testator's intent is for any reason uncertain. *Id.* An ambiguity in a will must be found without reliance on extrinsic evidence before extrinsic evidence is admissible. *In re Kelly's Estate*, 373 A.2d 744, 747 (Pa. 1977). A court may not rewrite an unambiguous will. *In re Wilton*, 921 A.2d 509, 513 (Pa. Super. 2007).

In addition, in ascertaining the testator's intention, a will is to be construed as of the date of its execution. *Estate of Sellers*, 496 A.2d 1237, 1240 (Pa. Super. 1985). Accordingly, evidence of *inter vivos* gifts to named beneficiaries made after the execution of a will may not be considered as probative of what the testator intended at the time of execution. *Id.*

Executor's first five assignments of error may be distilled to one core issue: Whether the Orphans' Court committed an error of law in considering extrinsic evidence of Testator's *inter vivos* gifts to determine his testamentary intent. We conclude that it did.

The terms of Testator's will are clear: the residuary estate is to be divided equally amongst the four children. Peter did not allege, nor did the

court find, that the will contained ambiguities, either patent or latent.[1] Nevertheless, the Orphans' Court relied upon extrinsic evidence to determine the testator's intent. Specifically, the court looked to events that occurred in the intervening years between the will's execution and Testator's death and

---

[1] There are two types of ambiguity: patent and latent. *In re Estate of Beisgen*, 128 A.2d 52, 55 (Pa. 1956); *Krizovensky v. Krizovensky*, 624 A.2d 638, 643 (Pa. Super. 1993). This court has described the difference between patent and latent ambiguity as follows.

> A patent ambiguity appears on the face of the [document] and is a result of defective or obscure language. A latent ambiguity arises from collateral facts which make the meaning of a written [document] uncertain, although the language appears clear on the face of the [document]. To determine whether there is an ambiguity, it is proper for a court to hear evidence from both parties and then decide whether there are objective indications that the terms of the [document] are subject to differing meanings.

*Krizovensky*, 624 A.2d at 643. "Where a latent ambiguity exists we have repeatedly held that parol evidence is admissible to explain or clarify the ambiguity, irrespective of whether the latent ambiguity is created by the language of the Will or by extrinsic or collateral circumstances." *Beisgen*, [] 128 A.2d at 55; *see also In re Bloch*, [] 625 A.2d 57, 61 ([Pa. Super.] 1993)[]; *Estate of McKenna*, [] 489 A.2d 862, 865 ([Pa. Super.] 1985) (where the court cannot confidently discern the testator's intent from the will itself, the court may "inquire into the circumstances of the testator at the time of execution of his will and other evidence which bears on intent"). Where a latent ambiguity exists, the court may resort to parol evidence (such as testimony of the scrivener) to determine the decedent's true intent. *McKenna*, 489 A.2d at 867. One limitation to the foregoing is that "[e]xtrinsic evidence of surrounding facts must only relate to the meaning of ambiguous words of the will. It cannot be received as evidence of testator's intention independent of the written words employed." *Beisgen*, [] 128 A.2d at 55.

*In re Estate of Schultheis*, 747 A.2d 918, 923 (Pa. Super. 2000) (emphasis added).

drew conclusions as to how Testator would have wanted his estate distributed in light of those events. The court reasoned that, because the will provided that residue be divided equally amongst Testator's four children, it was Testator's global estate-planning goal to benefit his four children equally. As a result, in light of the *inter vivos* transfers made by Executor to himself and his sisters under the power of attorney, the court disregarded the plain language of the will in an attempt to carry out this presumed goal. In doing so, the court used extrinsic evidence to create an ambiguity in an otherwise unambiguous will. However, any ambiguity in a will "must be found without reliance on extrinsic evidence <u>before</u> extrinsic evidence is admissible." ***In re Kelly's Estate***, 373 A.2d a 747 (emphasis added). The court's reliance on extrinsic evidence to determine Testator's intent was impermissible, as the terms of the will were clear and unambiguous.

Moreover, to the extent the court considered the *inter vivos* transfers to Dimiter, Karin, and Ingrid to be advancements against the recipients' residuary shares, the court also erred. An advancement "is an irrevocable gift by a parent to a child in anticipation of such child's future share of the parent's estate." ***Estate of Allen***, 412 A.2d 833, 839 (Pa. 1980). However, the concept of an advancement, in its strict technical sense, relates exclusively to cases of intestacy. ***Id. See*** 20 Pa.C.S.A. § 2109.1 ("If a person dies intestate as to all or any part of his estate, property which he gave in his lifetime to an heir is treated as an advancement against the latter's share of the estate only if declared in a writing by the decedent or acknowledged in writing by the heir

to be an advancement."). Where a decedent dies testate, and the will does not refer to advancements, "it is considered that the will extinguishes or merges all prior advancements. The law presumes that by making such a will testator disposed of his estate as he desired and with due consideration for the rights of those to whom advancements had been made." **Estate of Allen**, 412 A.2d at 839, quoting **Laughlin Estate**, 46 A.2d 477, 479 (Pa. 1946). Here, the will makes no reference to advancements. Thus, although it is clear that Testator, as expressed by the terms of his will, contemplated equality in the distribution of his estate amongst his children, it is equally clear that he did not contemplate that any *inter vivos* gifts were to be charged against the recipients' shares of the residuary estate. Accordingly, it was error for the court to treat the gifts as *de facto* advancements.

Although the court may have been motivated by a sense of fairness to all parties involved, in construing Testator's will to conform to the court's belief as to what it thought Testator "might or would or should have said in the existing circumstances," **Houston's Estate**, 201 A.2d at 595, it committed an error of law. Testator's will is clear and unambiguous and, as such, the estate must be distributed in accordance with the terms thereof.

Executor's remaining appellate issues all involve the court's decision to require the proceeds of the B & B Bank account, jointly titled in Executor's and Karin's names and funded during Testator's lifetime with Testator's money, be included in an amended account. This was also error on the part of the court.

The question of whether the B & B Bank account was properly characterized as an asset of Testator's estate was not raised by any party in the proceedings before the Orphans' Court. Peter's sole filing in the Orphans' Court was a petition to remove the Executor. The court denied that petition, *see* Orphans' Court Order, 4/13/18, and Peter did not appeal that decision. Procedurally, the proper mechanism for challenging the Executor's failure to include estate assets in the account is to file objections to the account, which Peter did not do. Nor did he seek an accounting of Executor's actions as power of attorney. Moreover, the issue was neither argued at the hearing, nor briefed by the parties in the court below. Thus, when the court ordered Executor to file an amended account to include the B & B Bank account, it acted *sua sponte*.[2] "[I]t has long been held that a court may not raise an

_____

[2] In its memorandum opinion, the Orphans' Court provided no explanation for its directive that Executor account for the B & B Bank account as an asset of the estate, despite the fact that the account was not titled in the name of Testator at the time of his death. The court merely noted the following:

> At the time of Decedent's death, the only remaining assets were the balance in a TD Ameritrade account and an account at B & B Bank in Executor's and his sister Karin's names. The B & B Bank account had been funded with Decedent's money during his life and used by Dimiter to pursue Decedent's needs and wishes. The B & B Bank funds are not accounted for in the Accounts of Decedent's Estate and the proposed distribution presented to the [c]ourt.

Orphans' Court Opinion, 4/30/18, at [2]. In light of the court's silence as to its reasoning, we can only speculate as to why the court ruled as it did. It is possible that the court concluded, based upon Executor's testimony, that the account was merely a "convenience account," created for the sole purpose of

issue *sua sponte* that does not involve the court's subject matter jurisdiction."[3]

***Hertzberg v. Zoning Bd. of Adjustment of City of Pittsburgh***, 721 A.2d 43, 46 n.6 (Pa. 1998). Nor should a trial court act as a party's advocate. ***Yount v. Pennsylvania Department of Corrections***, 966 A.2d 1115, 1119 (Pa. 2009). By *sua sponte* deciding that the B & B Bank account was an asset of the estate when the issue had not been raised by either party, the Orphans' Court deprived the Executor of an opportunity to be heard and inappropriately acted as an advocate for Peter. Accordingly, we must reverse.

Order reversed. Case remanded for proceedings consistent with the dictates of this opinion. Jurisdiction relinquished.

---

facilitating payment of Testator's bills, and that the transfer did not constitute a completed *inter vivos* gift to Executor and his sister. It is also possible that the Court, in its misguided quest to equalize the shares of Testator's four children, simply concluded that Peter was entitled to the funds in the B & B Bank account and acted accordingly. Ultimately, however, the court's rationale is irrelevant, as the issue was not properly before it.

[3] There are a few discrete, limited non-jurisdictional issues that courts may raise *sua sponte*. ***See, e.g.***, ***Commonwealth v. Passaro***, 476 A.2d 346, 348 (Pa. 1984) (describing Pennsylvania's practice of dismissing pending appeals of escaped prisoners, which court may do *sua sponte*); ***Berg v. Nationwide Mut. Ins. Co., Inc.***, 6 A.3d 1002, 1015 (Pa. 2010) ("failure to include issues in Rule 1925(b) statement resulted in 'automatic' waiver, which could be found *sua sponte* by courts."); ***Commonwealth v. Stossel***, 17 A.3d 1286, 1290 (Pa. Super. 2011) (Superior Court has authority to consider *sua sponte* failure of trial court to conduct ***Grazier*** hearing to ensure that a defendant has knowingly and voluntarily waived his right to counsel for his first PCRA petition); ***Commonwealth v. Wolfe***, 106 A.3d 800, 801 (Pa. Super. 2014) (legality of sentence may be raised by Court *sua sponte*).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/01/2019